**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Ave.
Tucson, AZ 85701

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC,
1225 E. Intl Rd, Suite 220
Anchorage, AK 99518

*Plaintiffs*,

v.

DOUG BURGUM, in his official capacity as Secretary, U.S. Department of the Interior,
1849 C Street, NW
Washington, DC 20240,

MIKE OLSEN, in his official capacity as Acting Director, Bureau of Safety and Environmental Enforcement,
1849 C Street, NW
Washington, DC 20240,

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT,
1849 C Street, NW
Washington, DC 20240,

*Defendants*.

Case No. 1:26-cv-3996

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. In this case, Plaintiffs Center for Biological Diversity and Sovereign Iñupiat for a Living Arctic (Plaintiffs) challenge the unlawful decisions of Defendants the Secretary of the U.S. Department of the Interior, the Bureau of Safety and Environmental Enforcement, and the

Bureau's Acting Director (collectively, BSEE)[1] to extend the offshore oil and gas leases that constitute the Liberty Unit on the Alaska Outer Continental Shelf. These decisions—which implicate issues of national importance regarding oil drilling in the Arctic Ocean and the preservation of endangered species and marine mammals—are arbitrary and capricious, in excess of the agency's statutory authority, and otherwise not in accordance with the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, or the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).

2. The Liberty Unit includes three federal offshore oil and gas leases near Foggy Island Bay in the Beaufort Sea. The leases, now owned by Hilcorp Alaska, LLC (Hilcorp), had an initial period of ten years. Because the leases never produced oil or gas, they normally would have expired at the end of that term. However, BSEE and its predecessor agency issued a series of lease extensions (called suspensions of production, or SOP) that kept the leases active.

3. After decades of failing to produce oil from the Liberty Unit, Hilcorp requested another SOP in August 2024, which BSEE denied in December 2024. The leases then expired and the Liberty Unit terminated.

4. Yet in April 2025, BSEE issued a decision purporting to rescind its December 2024 decision denying Hilcorp's SOP request. Subsequently, in November 2025, BSEE issued Hilcorp a new SOP, asserting it was in the national interest to give Hilcorp more time to develop the Liberty Unit leases.

---

[1] The Secretary of the Interior recently signed an order to combine BSEE and its sister agency, the Bureau of Ocean Energy Management, into a single agency called the Marine Minerals Administration. *See* U.S. Dep't of the Interior, Secretarial Order No. 3451, Establishment of the Marine Minerals Administration (July 10, 2026), https://www.doi.gov/document-library/secretary-order/so-3451-establishment-marine-minerals-administration. Because the relevant documents refer to BSEE, this complaint does as well.

5. These 2025 decisions are unlawful. Because the leases had expired, BSEE lacked the authority to rescind its prior decision denying the SOP or to issue a new SOP. Moreover, in issuing the new SOP, BSEE failed to consider several factors highly relevant to the national interest. For example, the agency ignored evidence regarding the heightened risk of oil spills when drilling for oil in the Arctic Ocean and the inherent harms to public health, endangered species, and subsistence practices. BSEE also ignored Hilcorp's well-documented history of oil spills, gas leaks, and violations of environmental and safety regulations at its operations elsewhere in Alaska. Moreover, the agency failed to explain its change in position from its December 2024 decision to deny Hilcorp's SOP request.

6. Accordingly, Plaintiffs seek an order (1) declaring BSEE's rescission of its prior denial of the SOP request and its issuance of a new SOP unlawful; (2) vacating the April 2025 rescission and November 2025 SOP; and (3) declaring the Liberty Unit leases terminated.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments and grant relief in cases of actual controversy); and 5 U.S.C. § 702 (APA). BSEE's April 2025 decision to rescind its prior decision denying the SOP and its November 2025 SOP are final agency actions for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

8. An actual, justiciable controversy now exists between Plaintiffs and BSEE, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

9. Venue is proper in this Court under 28 U.S.C. § 1391(e) because BSEE resides in this District and a substantial part of the events or omissions giving rise to the claims have occurred in this District. For example, BSEE's Acting Director, whose office is located in this District, issued the November 2025 SOP; and the Associate Deputy Secretary of the Department of the Interior, whose office is also located in this District, issued the April 2025 order purporting to withdraw the denial of Hilcorp's SOP.

## PARTIES

### Plaintiffs

10. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (Center) is a nonprofit organization that maintains offices across the United States, including Washington, D.C., and Alaska. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 130,000 members. The Center brings this action on behalf of its members.

11. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as whales, polar bears, ice seals, and corals are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Arctic Ocean from new oil and gas drilling projects, including Liberty.

12. Center members live near or visit the Beaufort Sea and coastal areas to be affected by oil and gas activities under the Liberty Unit leases. While in the area, Center members engage in vocational and recreational activities such as viewing and studying wildlife (including polar

bears, ringed and spotted seals, bowhead whales, and spectacled eiders and other birds) and photography. Center members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. Center members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

13. Plaintiff SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC (SILA) is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members. SILA's mission is to create space for healthy communities (spiritually, mentally, and physically), fostering the connection between people, culture and land. SILA seeks to accomplish its mission through community and shareholder engagement, knowledge-sharing events, political advocacy, and revitalizing Iñupiaq intergenerational culture and language. SILA's major focus is uplifting the voices of communities in Arctic Alaska, including the Iñupiat communities who call the Beaufort Sea region home. SILA members live, fish, and hunt in the Beaufort Sea and coastal areas that would be affected by oil and gas activities under the Liberty Unit leases.

14. The decisions the federal government makes regarding oil and gas development shape the conditions under which Iñupiat Peoples gather food, maintain cultural practices, and sustain relationships with the land and waters that have supported them since time immemorial. As such, SILA works to ensure that federal actions do not compromise the long-term health of their homelands or the ability of future generations to live and thrive on these lands.

15. Offshore oil and gas activities degrade these lands and threaten wildlife and the coastal environment that Center and SILA members use and enjoy. Offshore oil and gas activities also threaten SILA's members' ability to continue their traditional cultural practices and ways of life. For example, offshore oil and gas activities cause oil spills. Oil spills have a wide array of lethal and sublethal impacts on marine species, both immediate and long term. Direct impacts to

wildlife from exposure to oil can include disease, suppressed growth, and death. Oil can also harm wildlife through reduction of key prey species. Oil destroys the waterproofing and insulating properties of feathers and fur of birds and mammals, respectively, compromising their buoyancy and ability to thermoregulate. The harsh environment of the Arctic Ocean increases the risk and impacts of oil spills.

16. Additionally, offshore oil and gas activities increase air pollution that is harmful to Plaintiffs' members. For example, it emits small particulate matter that negatively affects human health in several ways, including difficulty breathing and decreased lung function. Offshore oil and gas activities also discharge wastewater that contaminates the ocean with pollutants that are toxic to marine species. Oil and gas drilling also increases the greenhouse gas emissions driving climate change.

17. Offshore oil and gas activities also adversely affect the wildlife Plaintiffs' members use and enjoy. Offshore oil and gas activities require the shipment of equipment to oil rigs and platforms, thereby increasing ship traffic, which in turn increases ocean noise and the risk of vessel strikes of bowhead and other whales, birds, and other animals. The light pollution from offshore oil and gas operations can harm and kill migratory birds such as spectacled eiders. The light pollution also leads to light entrapment, when birds circle a light until they die of exhaustion or collide with infrastructure. Infrastructure can otherwise cause fatal strikes of these and other migratory birds.

18. BSEE's rescission of its prior denial of Hilcorp's SOP and BSEE's 2025 SOP degrade Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the Beaufort Sea, surrounding coastal areas, and the wildlife found in these areas. Without these decisions, the Liberty Unit leases would no longer exist. Keeping the leases active means

that Hilcorp can engage in certain "ancillary activities" such as geological, geophysical, and geotechnical surveys that cause noise pollution harmful to marine life. Additionally, under the terms of the SOP, Hilcorp must engage in oil and gas activities by specific deadlines. For example, Hilcorp must submit a finalized extended-reach-drilling well design to BSEE by April 2026; mobilize a drilling rig by February 2028; commence drilling operations for the first well top hole by March 2028; and complete drilling, testing, and commissioning of the first well by February 2029. The SOP extends oil and gas activities off Alaska and all the harmful environmental impacts such activities cause. These include harm to air and water quality as well as harm to wildlife that Plaintiffs' members study, observe, and enjoy, decreasing their spiritual and cultural experiences and their recreational interests in viewing species that abandon the area because of these activities or are otherwise affected by them. *See California v. Norton*, 311 F.3d 1162, 1173 (9th Cir. 2003) (recognizing that lease "suspensions represent a significant decision to extend the life of oil … production …, with all of the far reaching effects and perils that go along with offshore oil production").

19. For example, one SILA member lives in Kaktovik, Alaska, which is within the Arctic National Wildlife Refuge. He has conducted many polar bear viewing trips in the Refuge to show people the beauty of the land and its wildlife through his business Kaktovik Arctic Adventures. As an Iñupiat, he and his family also rely on subsistence hunting activities, both on land and in the ocean. Oil spills, water pollution, noise pollution, vessel strikes, and other impacts from oil and gas activities under the Liberty Unit leases will harm the polar bears, other wildlife, and habitats that his business has depended on, as well as his subsistence way of life.

20. Additionally, one Center member often travels to the Arctic to engage in recreational activities, including hiking and rafting. These trips have taken her across the Arctic,

including a trip that involved floating the Kavik River to the Beaufort Sea coast, and then walking along the Beaufort Sea coast to Deadhorse. On these trips, she enjoys the beauty of the landscape, and her experiences are enhanced by seeing animals on these trips, including migratory birds such as eiders, sandpipers, plovers, as well as caribou, brown bears, polar bears, gray whales, and foxes. She intends to continue engaging in these trips in the future. Noise pollution, oil spills, and other impacts from oil and gas activities under the Liberty Unit leases would harm these habitats and the animals that depend on them, harming her interests in recreating in the Arctic, including areas near the Liberty Unit leases.

21. The above-described recreational, professional, aesthetic, cultural, subsistence, spiritual, and other interests have been, are being, and will continue to be adversely affected and irreparably injured by BSEE's actions. BSEE rescinded its decision denying Hilcorp's SOP and issued a new suspension after those leases had already expired, and it did so without examining the numerous environmental harms of extending the leases. BSEE is therefore failing to adequately protect Alaska's ocean and coastal environment, already imperiled wildlife, and Plaintiffs' members who live in and visit affected areas—exposing these people and nationally important resources to increased harm.

22. Plaintiffs' members have no adequate remedy at law, and the requested relief is proper. Relief in this case would ensure that the Liberty Unit leases would expire as OCSLA intends. An order declaring BSEE's actions unlawful and vacating BSEE's rescission decision and 2025 SOP would redress the injuries of Plaintiffs' members.

**Defendants**

23. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior and is sued in his official capacity. The Department of the Interior is responsible for

managing and overseeing the development of oil and gas resources on the outer continental shelf. Secretary Burgum is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Department of the Interior and its bureaus comply with all applicable laws and regulations, including OCSLA and the APA.

24. Defendant MIKE OLSEN is the Acting Director of the Bureau of Safety and Environmental Enforcement. Mr. Olson is sued in his official capacity. Mr. Olsen has responsibility for implementing and fulfilling the Bureau's duties under OCSLA and the APA.

25. Defendant BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT is a federal agency within the Department of the Interior. BSEE is charged with permitting drilling in federal waters, approving or denying lease suspensions, and ensuring offshore oil and gas activities comply with safety and environmental regulations.

## LEGAL BACKGROUND

### Outer Continental Shelf Lands Act

26. OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for purposes of exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356c, 1801–1866. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id.* § 1331(a).

27. OCSLA declares that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public" and specifically requires oil production be consistent with "national needs," "subject to environmental safeguards," and balanced "with protection of the human, marine, and coastal environments." *Id.* §§ 1332(3), 1802(2). Under OCSLA, "leasing must not proceed without due regard for the communities and environments it

affects." *Healthy Gulf v. U.S. Dep't of Interior*, 152 F.4th 180, 193 (D.C. Cir. 2025).

28. In 1978, Congress "transformed OCSLA from 'essentially a carte blanche delegation of authority to the Secretary'… into a statute with a 'structure for every conceivable step to be taken' on the path to development of a[] … leasing site." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 593–94 (D.C. Cir. 2015) (citation omitted).

29. There are four primary stages to developing an offshore oil well: "(1) formulation of a 5-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984); *superseded by statute on other grounds*, Coastal Zone Act Reauthorization Amendments of 1990, Pub. L. No. 101-508, 104 Stat. 1388, 1388-307.

30. "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the [outer continental shelf]." *Sec'y of the Interior*, 464 U.S. at 337.

31. At the second stage, the Secretary holds lease sales and can grant offshore oil and gas leases. 43 U.S.C. § 1337(a)(1). An oil and gas lease "entitle[s] the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id.* § 1337(b)(4).

32. Generally, leases are valid for an initial period of five years, which the Secretary may increase to a maximum of ten years if he "finds that such longer period is necessary to encourage exploration and development in areas because of unusually deep water or other unusually adverse conditions." *Id.* § 1337(b)(2)(B). Once production begins, a lease typically remains in effect "as long . . . as oil or gas is produced from the area in paying quantities." *Id.* § 1337(b)(2).

33. OCSLA authorizes the Secretary to "prescribe such rules and regulations as may be necessary" to manage oil and gas activities, including for the protection of natural resources. *Id*. § 1334(a). OCSLA specifies that such "regulations shall, as of their effective date, apply to all operations conducted under a lease." *Id*.

34. OCSLA also specifies that the Secretary's regulations must provide for "the suspension or temporary prohibition of any operation or activity, including production," in certain circumstances. *Id*. § 1334(a)(1).

35. The Secretary's authority under OCSLA is delegated to two bureaus within the Department of the Interior: BSEE and the Bureau of Ocean Energy Management (BOEM). BOEM is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf, including approving and managing development plans. 30 C.F.R. § 550.101. BSEE is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as issuing drilling permits. *Id.* § 250.101. BSEE is also responsible for directing lease suspensions and approving suspension requests. *See id*. § 250.180(b).

36. Under the regulations relevant here, a "lease expires at the end of its primary term unless [a lessee is] conducting operations on [its] lease." *Id*. § 250.180(a)(2). The regulations define "operations" as "drilling, well-reworking, or production in paying quantities." *Id.*

37. Similarly, where, as here, the leases are subject to a unitization agreement, the regulations state that "the entire lease continues for the term provided in the lease, and as long thereafter as any portion of your lease remains part of the unit area, and as long as operations continue the unit in effect." *Id*. § 250.1301(g). Additionally, 30 C.F.R. § 250.1301(g)(2) provides that "[w]hen a lease in a unit agreement is beyond the primary term and the lease or unit is not

producing, the lease will expire unless: (i) [the lessee] conduct[s] a continuous drilling or well reworking program designed to develop or restore the lease or unit production; or (ii) BSEE orders or approves a suspension of operations under § 250.170."

38. BSEE's regulations allow the agency to extend a non-producing lease beyond its initial term if the agency approves or directs a suspension of production in certain circumstances after making certain findings. *Id.* § 250.180(d).

39. For example, under 30 C.F.R. § 250.172, BSEE can grant an SOP to comply with a court order; "when activities pose a threat of serious, irreparable, or immediate harm or damage … to life (including fish and other aquatic life), property, any mineral deposit, or the marine, coastal, or human environment"; to install "safety or environmental protection equipment;" to comply with "[the National Environmental Policy Act] or to conduct an environmental analysis"; or there are "inordinate delays encountered in obtaining required permits or consents, including administrative or judicial challenges or appeals." *Id.* § 250.172. BSEE can also direct an SOP when the agency determines that the suspension "is in the National interest, and it is necessary because the suspension will meet one of [four] criteria," including allowing a lessee "to properly develop a lease, including time to construct and install production facilities." *Id.* § 250.174(a). As such, BSEE's regulations provide for SOPs to be used to pause existing production activities or to extend a non-producing lease.

**Administrative Procedure Act**

40. The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

41. Under the APA, courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A), (C).

## FACTUAL BACKGROUND

### The Liberty Unit Leases in the Arctic Ocean

42. The Liberty Unit consists of three federal offshore oil and gas leases near Foggy Island Bay in the Beaufort Sea. Until the leases expired in 2024, they were the only active offshore oil and gas leases entirely in federal waters remaining in the Arctic Ocean.




*Map of the Liberty Unit. Credit: Bureau of Ocean Energy Management*

43. The oil and gas leases constituting the Liberty Unit are decades old. Fina and Conoco acquired the oldest of the three leases, OCS-Y-1585, in Beaufort Sea Lease Sale 124, with an effective date of August 1, 1991. BP Exploration Alaska acquired the second lease, OCS-

Y-1650, in Beaufort Sea OCS Lease Sale 144, with an effective date of October 1, 1996. BP acquired the third lease, OCS-Y-1886, in Beaufort Sea OCS Lease Sale 202, with an effective date of July 1, 2007. Leases OCS-Y-1585 and OCS-Y-1650 were approved for unitization under the Liberty Unit Agreement on June 27, 2003, and BSEE approved OCS-Y-1886's addition to the Liberty Unit on April 21, 2016. Hilcorp became the primary owner of the Liberty Unit in 2014. No oil company has ever produced oil or gas from the Liberty Unit.

44. In 1997, BP performed the first Liberty well test and claimed to have discovered an estimated 120 million barrels of oil in the Liberty Prospect. BP then began developing a production plan for the Liberty Project in 1998, based on a project model that would require the construction of an artificial gravel island in the Beaufort Sea connected to an onshore pipeline.

45. After a few years of initial environmental analysis, including consideration of project threats to bowhead whales and other marine mammals, and after receiving a lease extension from BSEE's predecessor agency in 2001, BP announced in 2002 that it was putting the Liberty Project on hold.

46. In 2007, BP submitted a revised development plan with a new "ultra-extended reach" drilling method to access the Liberty Unit from existing offshore drilling pads. BP again put the project on hold in 2012, after receiving another lease extension from BSEE.

47. In 2014, after Hilcorp became the project operator, Hilcorp submitted a new development plan going back to the artificial offshore gravel island concept rather than the ultra-extended reach drilling concept. In 2014 and 2017, Hilcorp requested and received a lease suspension to give BOEM time to review its development and production plan.

48. In 2018, following a public comment period on a draft development and production plan and draft environmental impact statement, BOEM approved Hilcorp's

development and production plan for the Liberty Project. The Center and other organizations challenged that decision in the Ninth Circuit Court of Appeals, arguing that the agency failed to adequately examine the project's harmful effects on climate change and polar bears, as required by law. The Ninth Circuit agreed and threw out BOEM's approval of the project. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020).

**The Harms from Oil and Gas Drilling in the Arctic Ocean**

49. The Liberty Unit leases are in the most biologically diverse community in the Beaufort Sea: the Boulder Patch. The Boulder Patch is a unique and isolated area of boulders, cobbles, and pebbles that supports the only known kelp community in the Alaskan Arctic and provides important habitat for a wide array of species. The area is home to beluga whales, spotted seals, and several other marine mammal species protected under the Endangered Species Act, including bowhead whales, polar bears, bearded seals, and ringed seals. It also provides foraging and staging habitat for a variety birds, including loons, shorebirds, and seabirds such as the spectacled eider, which is protected under the Endangered Species Act. The area also supports numerous fish species, including Pacific salmon, whitefish, Arctic char, Dolly Varden, cod, Arctic flounder, fourhorn sculpin, kelp snailfish, capelin, and ninespine stickleback. The coastal areas near the leases are home to caribou, muskoxen, grizzly bears, Arctic foxes, and several small mammals.

50. Oil and gas activities under the Liberty Unit leases will cause oil spills, noise pollution, air pollution, vessel strikes, and other negative impacts that will harm wildlife, as well as nearby communities and their subsistence practices.

51. Oil spills are inevitable consequences of oil drilling. Oil spills can occur during every phase of offshore drilling from exploration to extraction to transportation and refinement.

And while there are inherent risks in any offshore drilling, Arctic federal waters are especially susceptible to devastating disasters and oil spills that would be nearly impossible to clean up.

52. Oil spills can harm wildlife in numerous ways. Oil can coat animals' fur, feathers, or skin—impairing their insulation, water repellency, or breathing. Animals can also ingest and inhale oil, causing poisoning and death, organ damage, or respiratory problems. Moreover, oil can contaminate the water column and the seafloor where prey species live, causing indirect effects on wildlife by reducing their key food sources. An oil spill from activities under the Liberty Unit leases can harm or kill the animals found in the area.

53. Polar bears are particularly vulnerable to oil spills. Polar bears must maintain a pristine coat as insulation against the cold. When a polar bear encounters spilled oil, it can soak into its pelage and persist for several weeks. During this time, it will be ingested during grooming, irritate the skin, and destroy the insulating abilities of the fur. Studies show that fatalities can occur from physiological effects on lungs, kidneys, blood, gastrointestinal tract, and other organs and systems, even in the absence of the thermal effect.

54. Oil spills can also kill individual ice seals. For example, during the nursing period, ringed, bearded, and spotted seals return to the water several times a day between nursing bouts, increasing the chances of repeated contact with oil. Additionally, seals depend on scent to establish a mother-pup bond, and mothers often do not recognize their oil-coated pups. Oiled pups may be prematurely abandoned, reducing the pup's chances of survival.



*Spotted seal mother and pup. Photo: NOAA Fisheries*

55. Exposure to crude oil also adversely affects fish at all stages. Early-life stages of fish are particularly sensitive to the effects of toxic oil components such as polycyclic aromatic hydrocarbons, which can cause larval deformation and death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver, changes in heart and respiration rates, fin erosion, and reproductive impairment. Additionally, fish are at risk from lethal coating of their gills with oil and declines in and contamination of their food sources. Exposure to crude oil has also been linked to long-term population effects in fish. A study based on 25 years of research demonstrated that embryonic salmon and herring exposed to very low levels of crude oil can develop heart defects that impede their later survival.

56. Offshore oil and gas drilling activities also increase vessel traffic by, for example, the servicing of wells and transporting materials. This increases the risk of vessel strikes of various endangered animals, including bowhead whales. Vessel strikes can kill or injure large whales and other animals by causing blunt force trauma, resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or

amputations. Bowhead whales are especially vulnerable to vessel strikes because of how much time they spend near the surface of the water and their slow swimming speed.



*Bowhead whales off the Alaska coast. Photo: NOAA Fisheries*

57. Offshore oil and gas activities also cause noise pollution that harms marine mammals, fish, and other marine life. Human-caused noise pollution can mask marine mammal communications at almost all frequencies these mammals use. Masking may affect marine mammal survival and reproduction by inhibiting these animals' ability to engage in essential behaviors such as feeding or attracting mates. For example, the Liberty Unit leases are located near an important reproductive area for bowhead whales where cow-calf pairs occur during the fall. These whales use sound for navigation, communication, and mating, and they are known to have complex vocalizations during mating season. Bowhead whales are sensitive to low-frequency noise, such as that from large vessels, drilling operations, and geological and geophysical surveys. Noise from activities under the Liberty Unit leases will displace whales from these sensitive areas and could interfere with important life functions.

58. Noise pollution also harms ice seals. Ice seals use sound for navigating, communicating, foraging, and avoiding predators. Ringed, spotted, and bearded seals found near the Liberty Unit leases are extremely sensitive to sound. Spotted seals have some of the lowest in-air hearing thresholds of any marine mammal, and they also have an extremely sensitive hearing range when underwater. Noise from activities under the Liberty Unit leases will interfere with these important life functions and disturb ice seals.

59. Noise and light pollution associated with oil and gas activities can harm and kill birds. Artificial light attracts birds at night and disrupts their normal behaviors in several ways. In a phenomenon called light entrapment, the birds continually circle lights and flares on vessels and energy platforms instead of foraging or visiting their nests, which can lead to exhaustion and mortality. Seabirds such as eiders, shearwaters, and petrels are especially vulnerable to light entrapment. Seabirds also frequently collide with platforms, rigs, oil and gas vessels, and light structures associated with oil and gas activities, thereby causing injury or mortality.



*Spectacled Eiders. Photo: U.S. Fish and Wildlife Service,*

60. Oil and gas drilling activity also releases harmful air pollutants like fine particulate matter and volatile organic compounds (VOCs). VOCs emitted during drilling

activities can include the "BTEX compounds"—benzene, toluene, ethyl benzene, and xylene—which are designated as hazardous air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term and long-term effects to the respiratory, nervous, and circulatory systems. Additionally, VOCs create ground-level ozone, or smog, which can contribute to asthma, premature death, stroke, heart attack, and low birth weight.

61. Oil and gas drilling also exacerbates climate change, which is already causing the loss of sea ice and permafrost, coastal erosion, sea level rise, more intense storms, and a higher risk of extinction for many species, among numerous other harms. Recent research indicates that the Arctic has been warming nearly four times faster than the global average, and Alaska is projected to experience more heating than any other U.S. state, with the greatest increases expected in the Alaskan Arctic. Scientists have determined that each barrel of federal oil left in the ground would equate to roughly half a barrel reduction in net oil consumption, with commensurate reductions in greenhouse gas emissions.

62. Hilcorp's poor track record of environmental and safety violations, as documented by the Alaska Oil and Gas Conservation Commission (Commission) and other records, only exacerbates the inherent harms of oil and gas drilling in the Arctic Ocean. According to the Commission, Hilcorp had more than two dozen violations over a 3.5-year period—so many that the Commission concluded that "disregard for regulatory compliance is endemic to Hilcorp's approach to its Alaska operations." The Commission reiterated Hilcorp's "substantial history of noncompliance" in an order issued December 2021. The Commission cited Hilcorp for another violation in June 2024, stating that this most recent violation "is not isolated and demonstrates Hilcorp's ongoing compliance problems" and that "[r]epeat violations call into question the effectiveness of Hilcorp's efforts to improve its regulatory compliance." Federal records and

other reports show that Hilcorp's operations in Cook Inlet and on the North Slope have caused numerous other accidents, oil spills, gas leaks, and violations of hazardous waste laws.

**The Recent Lease Suspensions for the Liberty Unit Leases**

63. From 2018 to 2021, Hilcorp requested and received several additional SOPs from BSEE. In requesting the suspensions, Hilcorp claimed they were needed because of the litigation over the approval of its development and production plan, as well as the company's failure to obtain BSEE's approval of its oil spill response plan (which is needed before any development activity can occur). BSEE identified several deficiencies in Hilcorp's proposed oil spill response plan. Among them was Hilcorp's failure to comply with the National Contingency Plan or Area Contingency Plan, which establish standards for preparing for and responding to oil spills and releases of other hazardous substances, because Hilcorp's proposal involved "Intentional Well Ignition," an unapproved oil spill response tactic.

64. The 2021 SOP was effective December 26, 2021, and lasted either three years or until BSEE approved an oil spill response plan. The 2021 SOP conditioned its approval on Hilcorp's compliance with its proposed schedule of work on the Liberty Unit and stated that Hilcorp's failure to achieve the milestones in that schedule could result in termination of the lease suspension.

65. From January through March 2024, BSEE and Hilcorp engaged in several communications and a meeting to discuss Hilcorp's intentions for the Liberty Unit, including the details of its oil spill response plan. BSEE also explained the upcoming expiration of the then-existing SOP; the differences between an oil spill response plan approval from BSEE and a development and production plan approval from BOEM; what Hilcorp would need to do in advance of seeking an additional suspension; and what any such request should address. At their

meeting, Hilcorp confirmed that it was evaluating an option to revise its development and production plan to develop the Liberty Unit from an onshore location rather than from the previously permitted artificial gravel island.

66. In May 2024, Hilcorp requested another meeting with both BOEM and BSEE, which was held in June 2024. Hilcorp informed BSEE and BOEM that it was not going to proceed with developing the Liberty Unit from a new artificial gravel island or from an onshore location. Instead, Hilcorp would change its entire plan and submit a new development plan to develop the Liberty Unit from an existing artificial drilling island called Endicott.

67. Following these discussions, Hilcorp submitted another SOP request to BSEE on August 12, 2024. That request sought a one-year suspension, pointing to the need to conduct environmental review and to delays with completing an adequate oil spill response plan. BSEE returned the request to Hilcorp, informing the company that the request was incomplete as it failed to comply with all the elements in the agency's regulations for requesting suspensions. Hilcorp then submitted a revised request on August 28, 2024.

68. On December 26, 2024, BSEE issued a decision denying Hilcorp's request. In that decision, BSEE determined that Hilcorp failed to "include a [commitment to production] that would lead to production prior to the end of the suspension." BSEE also concluded that supplemental information the company submitted earlier in December 2024, did "not cure these deficiencies" because Hilcorp "provide[d] no specific details regarding the[] sweeping categories of action" that Hilcorp claimed it would undertake. BSEE noted that such "omissions would not justify a 5-year suspension—the minimum time Hilcorp actually appears to require for production—much less the 1-year suspension Hilcorp has actually requested." BSEE also pointed to Hilcorp's failure to submit a complete development and production plan four years

after the Ninth Circuit's decision and "Hilcorp's inability or refusal to submit a complete [oil spill response plan] application to BSEE."

69. Following BSEE's decision, on January 21, 2025, the agency sent Hilcorp a notice stating that, given the denial of Hilcorp's SOP, the three Liberty Unit leases had expired, meaning the Liberty Unit had terminated.

70. Hilcorp appealed BSEE's SOP denial and notice of termination to the Interior Board of Land Appeals. The Board subsequently dismissed the appeal pursuant to a stipulation from the parties following BSEE's April 2025 decision to rescind and reconsider its December 2024 decision denying the SOP.

71. Then, on November 18, 2025, BSEE purported to issue a new SOP for the Liberty Unit leases. In that decision, BSEE stated that it would not decide Hilcorp's August 2024 SOP request because BSEE determined that it is in the national interest to direct a suspension under 30 C.F.R. § 250.174(a) and allow Hilcorp to develop the Leases.

72. In issuing this decision, BSEE claimed that the suspension was in the national interest because "the recoverable oil resources at stake for these Leases are estimated to be of such a quantity as to support production of up to 20,000 barrels of oil per day with transport through the Trans-Alaska Pipeline System, which will benefit Alaskans and all Americans well into the future." In so determining, BSEE relied on two Executive Orders: Executive Order 14156, *Declaring a National Energy Emergency*, and Executive Order 14153, *Unleashing Alaska's Extraordinary Resource Potential*, both dated January 20, 2025. BSEE did not consider any of the harms from oil and gas activities under the Liberty Unit leases (described above) to threatened and endangered species, marine mammals, coastal communities, subsistence practices, the climate, or other nationally important resources. BSEE also did not consider

Hilcorp's documented record of oil spills, other accidents, and failure to comply with safety and environmental regulations or how this record could increase the risk and harms from activities conducted under the leases. Nor did BSEE consider Hilcorp's history of failing to submit an adequate oil spill response plan and failure to otherwise demonstrate the requisite commitment to production under the Liberty Unit leases.

73. The November 2025 SOP contains a schedule of production that Hilcorp is expected to follow. Under that schedule, Hilcorp must, *inter alia*, submit a finalized extended-reach-drilling well design to BSEE by April 2026; mobilize a drilling rig by February 2028; commence drilling operations for the first well top hole by March 2028; and complete drilling, well testing, and commissioning of the first well by February 2029.

74. Before BSEE issued its November 2025 suspension, the Center sent BSEE a letter, on September 3, 2025, explaining that the agency lacked the authority to issue a new suspension because the Liberty Unit leases had expired. That letter also explained how new oil and gas production in the Arctic Ocean is antithetical to the national interest in addressing the climate crisis, promoting environmental justice, recovering endangered species, and otherwise protecting the environment given the numerous harms inherent in oil and gas drilling in the Arctic Ocean. BSEE did not respond to this letter.

75. Following BSEE's issuance of the November 2025 suspension, the Center and SILA sent BSEE a letter on February 9, 2026, notifying BSEE of their intent to sue over the agency's unlawful decision to issue a new SOP and requesting BSEE revoke its unlawful decision. BSEE has not done so.

## CLAIM FOR RELIEF

### Violations of the APA: Unlawful Rescission of Lease Extension Denial and Unlawful Directed Suspension of Production for the Liberty Unit

76. Plaintiffs reallege and incorporate each of the allegations in the proceeding paragraphs of this Complaint.

77. OCSLA requires that offshore oil and gas activity be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2).

78. OCSLA sets initial lease terms of five years, or up to ten years in certain circumstances, and leases remain valid as long as they are producing oil and gas in paying quantities. *Id*. § 1337(b)(2). Nonproducing leases expire at the end of their initial lease period. *Id.*; 30 C.F.R. § 250.180(a)(2).

79. The Liberty Unit leases had an initial period of 10 years and never produced oil or gas. When BSEE denied Hilcorp's August 2024 request for a suspension of production, the Liberty Unit leases expired and the Liberty Unit terminated.

80. BSEE lacked the legal authority to rescind the December 2024 decision denying Hilcorp's SOP because the Liberty Unit leases were expired and the Unit had terminated. BSEE's April 2025 decision to rescind its December 2024 decision denying Hilcorp's SOP therefore exceeded the agency's authority and is unlawful.

81. BSEE's April 2025 rescission decision is also unlawful because the agency failed to explain its change in position from its December 2024 determination that Hilcorp had not satisfied the requisite commitment to production of the Liberty Unit leases.

82. BSEE lacked the authority to issue an SOP because the Liberty Unit leases expired and the Unit had terminated. BSEE's November 2025 decision directing an SOP for the Liberty Unit leases therefore exceeds the agency's authority and is unlawful.

83. BSEE's November 2025 SOP is unlawful in other respects. BSEE's national interest determination failed to consider several highly relevant factors and reached a conclusion contrary to the evidence before the agency. BSEE looked only at the purported benefits of oil production under the Liberty Unit leases without considering any of the environmental harms that such activities would cause. BSEE did not consider, for example, the risks and harms of oil spills, noise pollution, air pollution, vessel strikes, climate impacts, or how Hilcorp's documented failure to comply with safety and environmental requirements could increase these risks and harms.

84. BSEE's November 2025 SOP also failed to consider relevant factors and reached a conclusion contrary to the evidence before the agency in determining that the suspension would enable Hilcorp to properly develop the Liberty Unit leases. BSEE did not consider Hilcorp's history of failing to submit an adequate oil spill response plan or its failure to otherwise demonstrate the requisite commitment to production under the Liberty Unit leases. BSEE also failed to explain its change in position from its 2024 decision to deny Hilcorp's August 2024 SOP request because Hilcorp had not demonstrated the requisite commitment to production.

85. BSEE's April 2025 decision rescinding its prior denial of Hilcorp's lease suspension request is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and otherwise not in accordance with OCSLA, its implementing regulations, or the APA. 5 U.S.C. § 706(2)(A), (C).

86. BSEE's November 2025 SOP is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and otherwise not in accordance with OCSLA, its implementing regulations, or the APA. 5 U.S.C. § 706(2)(A), (C).

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court:

A. Declare that BSEE's April 2025 rescission decision and its November 2025 SOP for the Liberty Unit are arbitrary, capricious, in excess of statutory authority, or otherwise not in accordance with OCSLA, its implementing regulations, and the APA;

B. Vacate BSEE's April 2025 rescission decision and November 2025 SOP for the Liberty Unit;

C. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

D. Grant such other relief as the Court deems just and proper.

Respectfully submitted this 12th day of November, 2026,

/s/ *Kristen Monsell*
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150
kmonsell@biologicaldiversity.org

/s/ *Rebecca Noblin*
Rebecca Noblin (AK Bar No. 0611080)*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
Phone: (907) 350-4822
Email: rnoblin@biologicaldiversity.org

*/s/ Emily Jeffers*
Emily Jeffers (CA Bar No. 274222)*
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150
Email: ejeffers@biologicaldiversity.org

*Seeking admission *pro hac vice*

*Attorneys for Plaintiffs*